UNITED STATES DISTRICT COURT FOR

THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SHEILA WILLIAMS AKA SHEILA FOSTER, AS INDIVIDUAL <br><br> Plaintiff, <br><br> v. <br> UNITED AIRLINES, INC. <br><br><br><br><br><br> Defendant. | § § § § § § § § § § § § § § § § § § § § | Civil Action No.: <br><br><br><br><br><br> COMPLAINT FOR <br> VIOLATIONS OF THE AMERICAN WITH DISABILITIES ACT OF 1990 AND THE AMERICAN WITH DISABILITIES AMENDMENTS ACT OF 2008 <br><br><br> JURY TRIAL DEMAND |

_____

# COMPLAINT
_____

### NATURE OF CASE

1. This is an action to recover damages and civil penalties for violations of Plaintiff's civil rights protected by The American with Disabilities Act of 1990 and the American with Disabilities Amendments Act of 2008 ("ADA"), which prohibits certain unlawful employment practices such as discrimination of a disabled person in the workplace.

2. Plaintiff seeks redress for discriminatory practice by Defendant against her in violation of The Americans with Disabilities Act Amendments Act of 2008. Plaintiff alleges discrimination based on a disability, which Defendant had full knowledge of her disability for a number of years.

### JURISDICTION AND VENUE

3. The jurisdiction of this Honorable Court is invoked pursuant to 28 U.S.C. § 1331 because the issues in this case raise federal questions under The American with Disabilities Act of 1990 and The Americans with Disabilities Act Amendments Act of 2008. The jurisdiction of this case is to secure the protection

of redress for deprivation of rights guaranteed by Federal Law, which rights provides for injunctive and other relief for violation of civil rights and discrimination in employment.

4. Pursuant to 28 U.S. Code § 1367, the court can hear in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5. United Airlines, Inc., may be served through their registered agent.

6. Venue is proper in the Southern District of Texas, Houston Division because the causes of action alleged accrued within said district. This court has jurisdiction over the causes of action alleged by Plaintiff pursuant to The Americans with Disabilities Act Amendments Act of 2008 ("ADA").

## PARTIES

7. Plaintiff, SHEILA WILLIAMS AKA SHEILA FOSTER, is an individual and resident of Houston, Texas. Plaintiff suffers from a physical impairment that substantially limits one or more of her major life activities. Plaintiff is a member of a protected group that falls within the broad definition of "disability," and was at all relevant times an employee within the meaning of the applicable statute.

8. Defendant, UNITED AIRLINES, INC. is an employer within the meaning of the statute because it engages in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year. Service of process may be perfected through Defendant' registered agent, CT CORPORATION SYSTEM located at: 1999 BRYAN ST., STE. 900 DALLAS, TX 75201.

## VICARIOUS LIABILITY-RESPONDEAT

9. Whenever in this pleading it is alleged that Defendant did any act or thing, or failed to do any act or thing, it is meant that Defendant's officers, owners, servants, agents, employees, or representatives, workers including but not limited to Gilbert Green, Kathy Page, Stephanie Stanky, Kim Kurr, Gwen Taylor, and/or Tonya Patterson did such act or thing, or failed to do such act or thing, or that such act or thing or omission was done in the course and scope of that person's employment at Defendant's, and/or in the furtherance of Defendant's interests, or with the full authorization, permission, tolerance,

and/or ratification of Defendant, were done by an authorized member of management of Defendant, or was done in the normal routine of the accepted, tolerated, or permitted conduct, customs, and/or practices of Defendant's officers, owners, servants, agents, employees, or representatives.

## FACTUAL BACKGROUND

10. Defendant is an employer within the meaning of The American with Disabilities Act of 1990 and The Americans with Disabilities Act Amendments Act of 2008 ("ADA"), in that it always employed the requisite number of employees relevant to this complaint.

11. Plaintiff, is a person with a disability engaged in EEO protected activity and was employed by Defendant, during all the alleged discriminatory actions in this complaint. The Defendant was aware of Plaintiff's Equal Opportunity ("EEO") activity, and Plaintiff's disability was known and documented.

12. In October of 2011, Plaintiff started her employment in the transportation department with Chelsea Foods, a division of Defendant's predecessor, Continental Airlines. During that time, Plaintiff injured her knee when she was coming down off the bed of a work truck. Her injury was deemed and On Job Injury (OJI) and Plaintiff was placed on disability. Once the extent of her injuries was determined, she was informed by her doctor that she could not return to transportation because of the extensive limitations caused by her injury. Her injuries became more severe, when other areas of her body began to experience pain because of the injury. When Plaintiff returned to work, she received reasonable accommodations from Chelsea. Plaintiff was then transferred into a production coordinator position and eventually was transferred to the airport division as a Part-Time Customer Service Agent.

13. In May of 2012, Defendant met with Plaintiff to discuss her work and injuries and how it impacted Plaintiff's position.  During that meeting, Defendant doubted the severity of Plaintiff's injuries and requested certification of injuries from a doctor (See Exhibit A).  In June 2012, Plaintiff provided Heath Care Certification from Defendant's doctor which stated the severity of Plaintiff's injuries and listed out limitations on what work could be performed by Plaintiff (See Exhibit B). Since 2012, Defendant knew of Plaintiff's injuries and to what extent that her work would be impacted.

14. Later in June 2012, Defendant held another meeting with Plaintiff to discuss accommodations, as was Plaintiff's right under the ADA. Defendant stated that after reviewing the doctor's certificate that outlined Plaintiff's disability, Defendant was unable to provide any accommodations as the doctor's certificate did not clarify the nature of Plaintiff's impairment, the duration of said impairment, and why Plaintiff's disability would necessitate accommodation in her current position (See Exhibit C). So, rather that assist their own employee and work with Plaintiff to accommodate her position with her disability, Defendant sent her on yet another task to gain more proof that she is injured/disabled.

15. Due to the continuous roadblocks that Plaintiff received from Defendant as it relates to accommodations with her position, Plaintiff requested a transfer to another position within the Company (See Exhibit D).

16. In May of 2015, Plaintiff interviewed for the position of "Customer Service Agent-Part-Time" with Defendant. At the time of her interview, there was no mention of "Mandatory Overtime" (See Exhibit H). When discussions of a union contract began, Plaintiff entered into discussions with Gilbert Greene and Kim Kerr in upper management in order to allow accommodations for her disability. Plaintiff was granted accommodations for her disability by exempting Plaintiff from "Mandatory Overtime." Plaintiff was also excused from work should other medical reasons arise, and then she would be required to provide a note to her supervisors. However, after these accommodations were agreed to, Plaintiff started receiving "points" on her record for missing work due to her taking certain medications, which did not allow her to function properly while at work. Plaintiff then had to visit Kim Kerr's office to get the points erased and the matter resolved. This seemed to be unnecessary as Plaintiff thought she had an agreed to accommodation, as was her right under the ADA. Later, Plaintiff's Doctor restricted her to work a certain number of hours a day because of her disability and the medication she was required to take. Due to her restrictions, Defendant informed Plaintiff that she could call staffing to let them know when she was leaving for the day.

17. Three months later in August of 2015, Defendant placed Plaintiff on workers' compensation leave when she had two surgeries on her shoulder, spine, and back. When Plaintiff wanted to return to work with partial restrictions, Defendant refused. Instead, Defendant placed Plaintiff on "Extended Illness

Status." This was detrimental to Plaintiff, and against her accommodations, because her "EIS" was paid through her allotted sick hours, and once she ran out of sick hours, she would be subject to administrative termination. Plaintiff has been out of work for almost two and half years. It appeared that the Defendant was directing the Plaintiff towards administrative termination by preventing her from returning to work, when she had been cleared, and forcing the Plaintiff to exhaust all her allotted sick time.

18. In January of 2018, Plaintiff was eager to return to work and submitted all of her disability paperwork to the Defendant. She also provided a doctor's note as to her restrictions (See Exhibit E). As required, Defendant sets a Reasonable Accommodations meeting to assess Plaintiff's restrictions and determine when she can return to work. This is afforded the Plaintiff under the protection of the ADA. During this meeting, no mention of mandatory overtime had been discussed. When Plaintiff had been working with Defendant's predecessor, she was not required to work mandatory overtime as an accommodation under the ADA; this accommodation was notated in her personnel file. Her previous supervisors (Stephanie Stanky, Gilbert Green and Kim Kerr) approved her accommodations for no mandatory overtime. Surprisingly (or conveniently from Defendant's perspective), Plaintiff's personnel file went missing soon after this was approved. During this time Kathy Page becomes the new director of Human Resources. Gwen Taylor, who was another administrator, informed Plaintiff that she could leave before mandatory overtime was requested. Once Kathy Page became HR director, she could not review any of this information since the Plaintiff's personnel file disappeared. Since Ms. Page could not corroborate the agreement and accommodations for the Plaintiff (who was protected under the ADA), a disagreement occurred since Defendant now refused to honor the accommodations that the parties had worked out.

19. Two months later in March of 2018, Plaintiff attempted to get her badges cleared for training, a requirement by the Defendant. Unfortunately, administrators Rico Wallis and Gwen Taylor pull Plaintiff out of her training and alleged that Plaintiff's badges were not cleared. Plaintiff suffered embarrassment and stress from being pulled out of class in from of other employees for something as trivial as a badge. It appeared that Plaintiff was being singled out for being disabled and was incurring

extra scrutiny that was not being done to non-disabled employees. Once Plaintiff is removed from the meeting, she is not allowed to return, and missed two days of training. Once the Plaintiff cleared the issue herself with no help from her superiors, she was then advanced to the next phase of training, even though she had not properly competed training, which was a result of the Defendant's intentional interruption. As was stated, other non-disabled employees received full and proper training.

20. A few months later in June 2018, Plaintiff was called another reasonable accommodation meeting. Plaintiff also provided a doctor's note stating she was cleared to work, as well as the restrictions on what job duties Plaintiff could perform (See Exhibit F). During this meeting, it was determined that Plaintiff would work 50% of her shift within a 2-week period. Plaintiff was on disability at the time and could only work 6 hours a day or stay part time. However, when Defendant unionized another accommodations meeting was held and once again Plaintiff was informed that she did not have to work "mandatory overtime" (See Exhibit G).

21. In August of 2018, Plaintiff worked mandatory overtime only because it was called during her 6-hour shift and stayed within her 6 hours. The Defendant is supposed to give its employees two hours' notice prior to calling mandatory overtime. Additionally, mandatory overtime was only to b called during a catastrophic event. Plaintiff stayed past her shift a second time, in order to finish up with a customer before she left work, adding an additional 25 minutes to her shift.

22. Two months later in October 2018, Defendant allows for bidding for job shifts to take place. Plaintiff was unable to bid on the computer, so Plaintiff called in to bid for a shift in "Zone 7." Kathy Page had a meeting with the supervisors in Zone 7 to discuss Plaintiff's accommodations from performing mandatory overtime. However, Ms. Page neglected to inform all supervisors. Due to this, Plaintiff had a disagreement with a supervisor when she tried to leave after her 6-hour shift. The issue was eventually resolved, but the supervisor informed Plaintiff that he was not told about her accommodations. Additionally, Plaintiff had trouble leaving her shift when the supervisors refused to sign her paperwork at the end of her 6-hour shift. Another accommodations meeting is called, and the administrators are concerned that Plaintiff can no longer do her job because she cannot stay past her 6-hour shift. Plaintiff had previously worked "mandatory overtime" with no issues as it did not exceed

her 6-hour limitation by her doctors.  What needs to be pointed out is the fact that Plaintiff was designated a part-time employee.  Part time means that she was working four out of eight hours per day, or half of the normal 40-hour work week.  Since Plaintiff was working part time shifts, then she could work mandatory overtime as any time that was over her scheduled shift time would be considered overtime, and she would comply with the essential job function as Defendant has outlined.  However, due to her being disabled, Defendant knowingly made it difficult for this to occur as they kept referring to mandatory overtime applied to a fulltime, 8-hour shift.  This was intentionally misleading and was done to prevent Plaintiff from working within the confines of her ADA protected accommodations. In the meantime, the Defendant attempts to transfer Plaintiff to another department. However, Plaintiff did not want to be transferred, since she could perform the job as required even though she was disabled. Since Plaintiff did not want to be transferred, the Defendant placed her on EIS again and she was removed from work. Once the Defendant did this, it forced the Plaintiff to use up the remaining sick time she had.  This meant that she could he administratively terminated; a work around that the Defendant was intentionally doing in order to avoid allegations of discrimination under the ADA. Plaintiff attempted to find another position with Defendant but was only referred to full-time positions that Defendant knew Plaintiff could not perform within her disability restrictions.

23. In November of 2018, Plaintiff learns that that her personnel file is still missing. Plaintiff schedules a meeting with Michelle Brown, who is the superior to Kathy Page. The issue of "mandatory overtime" is discussed yet again, and Ms. Brown and Ms. Page claim that Mr. Green never informed them that Plaintiff was excused from it as an accommodation protected by the ADA. Plaintiff then receives a letter that she will be terminated on December 4, 2018. However, Ms. Page called another accommodation meeting with Plaintiff; two union representatives were present as well. During this meeting, Ms. Page and Ms. Taylor admit to having knowledge of Plaintiff's accommodations from performing "mandatory overtime", and that they had been informed of this by Mr. Green. Ms. Page then informs Plaintiff that if her doctor can change her paperwork to reflect an 8-hour shift instead of 6-hour shift, then Plaintiff would be able to return to work. Rightfully, Plaintiff's doctor refuses to do

so because he believes that such an act would be falsifying information and perpetrating fraud. Plaintiff's doctor does write a note stating that there is no reason why Plaintiff should be off work.

24. In January 2019, another accommodation meeting is held, and Plaintiff's termination is extended to January 23, 2019. Plaintiff was not invited to this meeting at first, but then received a request to join the meeting from Ms. Page at the last minute. January 3, 2019 comes and goes and Plaintiff's EIS time officially expired.

25. In February 2019, Plaintiff received a letter that she was ineligible for reasonable accommodations because she could not perform the "essential functions" of her job. Plaintiff then receives a letter from Tonya Patterson at the corporate office that she is officially terminated.

## CAUSES OF ACTION

*ADA Disability Discrimination*

26. Plaintiff repeats and re-alleges all the facts set forth above.

27. Plaintiff contends that by the above-described actions of Defendants and or their agents and or/employees violated The ADAA of 2008 by discriminating against the Plaintiff on account of her disability was a motivating factor for adverse treatment to which she was subjected.

28. A violation of the Americans with Disability Act is an offensive occurrence which should not be taken lightly. A Defendant who discriminates against a disabled person is causing more pain and suffering, than to someone who is not disabled. Those with disabilities are already struggling to exist and perform in a workplace that does not have a long history of making accommodations for those that need them. The Act was implemented to prevent such discriminatory behavior from occurring, and to protect those that truly need it. Plaintiff Sheila Foster was subjected to discrimination under The Americans with Disabilities Act Amendments Act of 2008 because she was, (1) an individual with a disability, (2) was qualified for her job, and (3) was subject to an adverse employment decision on account of disability.

29. In applying the facts outlined above to the ADA definition, Ms. Foster was considered an employee with a disability because she had a physical impairment that substantially limited one or more major life activities.  This is not disputed and is well documented. Ms. Foster was examined by the medial department of United Airlines and her limitations were notated on an Assessment of Functional Capabilities (AFC) Form. The AFC form noted that she had long term function limitations that affected her for 90 days or greater. These restrictions included that she was unable to push, pull, lift or carry greater than 50lbs for no greater than 6 hours, unable to walk, sit or stand for more than 6 hours, and numerous other functions that she was unable to complete for more than 6 hours. This evaluation took place on numerous occasions, dating back to 1/10/2018 and 5/31/2018. All evaluations were completed by an agent of United Airlines and were included in her personnel file. Defendant United had full knowledge of Plaintiff's disability.

30. Defendant intentionally knowingly bypassed the accommodations and protections afforded disabled persons under the ADA by lying, ignoring and intimidating the Plaintiff during her process to seek reasonable accommodations. Defendant demonstrated a pattern of intentional behavior to ignore, refute, roadblock, and prevent any acknowledgement of Plaintiff's disability. This is apparent from the number of time that Plaintiff had to provide proof that she was disabled.  It is apparent from the number of times that Plaintiff had to meet with the same people to discuss accommodations, which were routinely ignored or limited. Defendant's agents intentionally withheld information from Plaintiff's supervisors to make it harder for her to leave after her 6-hour shift. This conduct continued to be extreme and outrageous because Defendant's agents pretended that they did not know of Plaintiff's accommodations, intentionally did not tell her supervisors that she was excused from "mandatory overtime," and then later admitted to knowing about accommodations and used it as an excuse to deny her accommodations. Defendant conveniently lost Plaintiff's personnel file that contained information of her reasonable accommodations, which is allowed under her protection by the ADA.  Defendant knowingly and intentionally used this lost file as an excuse to deny her previously agreed upon accommodations from "mandatory overtime."  This egregious behavior, in plain violation of the ADA, caused plaintiff severe emotional distress that materially disrupted her routine and

enjoyment of life. Plaintiff, a disabled person, was constantly over-looked, ignored, and lied to. Plaintiff was placed on leave for an extended amount of time, against her wishes, and was still terminated.

31. At the time that the Plaintive was administratively terminated, she was qualified to perform at her job. When Plaintiff was hired back in 2015, she was hired as an Airport Sales Agent (ASA) for a part-time position. The position itself had no mention of "mandatory overtime," which required employees to work up to four hours past their shift. At the time she was hired, the Defendant, was aware of her disability and status under the ADA and still chose to hire her. Plaintiff was determined to be "qualified" at the time she was hired in 2015. She was consistently evaluated under the Defendant's Assessment for Function Capabilities and Reasonable Accommodations Process meetings. The issue of her qualifications did not arise during her initial interview nor during the Reasonable Accommodations Process (RAP) meeting when she returned to work in January of 2018. In fact, Defendant's agents, Gilbert Greene and Kim Kerr, were well aware of her restrictions, which included working no more than six hours per day, and these restrictions were noted in her personnel file.  Additionally, during the November 2018 Rap meeting, Kathy Page admitted that she had spoken to Mr. Greene, and he had confirmed that he gave Plaintiff a reasonable accommodation of not working "mandatory overtime" because it was outside of her six hour per day restriction. However, this accommodation was placed in Plaintiff's personnel file that disappeared, (which is hard to fathom since most large companies have electronic personnel files as of 2018). Defendant used this missing file and the notes in it as an excuse not to corroborate Plaintiff's story, and to push her into a termination by forcing her to use up her EIS time.

32. Plaintiff had previously worked "mandatory overtime" with no issues as it did not exceed her 6-hour limitation by her doctors.  What needs to be pointed out is the fact that Plaintiff was designated a part-time employee.  Part time means that she was working four out of eight hours per day, or half of the normal 40-hour work week.  Since Plaintiff was working part time shifts, then she could work mandatory overtime as any time that was over her scheduled shift time would be considered

overtime, and she would comply with the essential job function as Defendant has outlined. However, due to her being disabled, Defendant knowingly made it difficult for this to occur as they kept referring to mandatory overtime applied to a fulltime, 8-hour shift. This was intentionally misleading and was done to prevent Plaintiff from working within the confines of her ADA protected accommodations. By doing this, the Defendant was able to keep Plaintiff on EIS so that her time would run out and Defendant could terminate Plaintiff's employment using other methods to cover the fact that the Defendant was violating the ADA.

33. Due to this behavior, Plaintiff was effectively Discriminated against based on The Americans with Disabilities Act Amendments Act of 2008. As established above, Plaintiff belongs to a protected group of persons because she is a person with a disability and the disability was effectively noted and communicated to the Defendant, and this cannot be disputed.

## DAMAGES

34. Defendant's conduct constitutes violations of statutory law. Such unlawful conduct seriously affected Plaintiff in her occupation. Because of Defendants' unlawful conduct, Plaintiff has suffered, suffers, and will continue to suffer humiliation, mental anxiety, and stress along with other damages. As a result of Defendant's discrimination in violation of the ADA, Plaintiff has been denied employment opportunities providing compensation and benefits, thereby entitling her to injunctive and equitable monetary relief; and has suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendant's actions, thereby entitling her to compensatory damages. In its discriminatory actions as alleged above, Defendant has acted with malice or reckless indifference to the rights of the above-named Plaintiff and class member, thereby entitling her to an award of punitive damages. Plaintiff seeks all general, special, and incidental and consequential damages in an amount of $335,000,000.00.

## JURY TRIAL DEMAND

35. Plaintiff demands a jury trial in this case.

**PRAYER**

WHEREFORE Plaintiff SHEILA WILLIAMS AKA SHEILA FOSTER, respectfully prays that Defendant be cited to appear and file an answer herein and that the Court award judgment in favor of Plaintiff at Defendant, jointly and severally, for all damages and amounts to which Plaintiff is entitled, plus any amounts allowable under law for pre-judgment interest, post-judgment interest, attorneys' fees, and court costs; tax the court costs and discretionary costs of this against Defendant; and award any such further relief, at law or in equity, to which Plaintiff may show it is justly entitled.

RESPECTFULLY SUBMITTED,

*/s/ Ross Reifel*
Ross B. Reifel
Texas Bar No. 24088286
S. D. Tex. 2543350
Reifel Law Firm, PLLC
4801 Woodway Dr., Suite 230W
Houston, Texas 77056
Telephone: (832) 241-7020
Facsimile: (832) 213-1230
E-Mail: rossreifel@reifelattomey.com

ATTORNEY FOR PLAINTIFF